UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                Plaintiff,

v.

CARDELL CLINTON CAMPBELL,

                Defendant.

_____/

CRIMINAL NO.  07-20472

DISTRICT JUDGE VICTORIA A. ROBERTS

MAGISTRATE JUDGE DONALD A. SCHEER

## REPORT AND RECOMMENDATION

## I.    RECOMMENDATION:

I recommend that Defendant Cardell Clinton Campbell's Motion to Suppress Evidence be denied.

## II.    REPORT:

### A.    Procedural History

Defendant Cardell Clinton Campbell was charged by Grand Jury Indictment, on September 25, 2007, with Conspiracy to Possess With Intent to Distribute Cocaine (Count I) and Possession With Intent to Distribute Cocaine (Count II).  Counsel was appointed, and Defendant entered a plea of not guilty on September 26, 2007.  On November 14, 2007, Defendant filed a Motion to Suppress Evidence, challenging the seizure of a kilogram of cocaine from his vehicle on September 14, 2007, as well as subsequent inculpatory statements by him in the wake of the drug seizure.  The motion was referred to the magistrate judge by Order of Reference on November 15, 2007.  The government filed its Brief in Opposition to the motion on November 27, 2007.

The motion was brought on for hearing on December 17, 2007, January 25, 2008 and April 4, 2008. The motion was taken under advisement, and the parties were directed to submit supplemental briefs. Defendant submitted his supplemental brief on June 10, 2008 (Document 60). The government's supplemental brief was filed on July 1, 2008 (Document 64), and Defendant's reply to the government's submission was filed on July 9, 2008.

**B.     Factual Record**

Based upon the evidence submitted by the parties, I find the following facts:[1]

1. The investigation of Defendant Campbell was initiated by Drug Enforcement Administration Special Agent Brian Malagrida (T2: 203; T3: 81, 83).

2. Malagrida received information from a confidential informant in mid August 2007 (T2: 203).

3. His investigation began on August 27, 2007 (T3: 83).

4. The informant reported that a subject known to him only as "Skip" resided at 6700 Iowa Street, in Detroit. He further reported that "Skip" was a multi-ounce level cocaine dealer with whom the informant had engaged in prior drug transactions. "Skip" was described as a slender individual, 5' 9" or 10" tall, with braids. The informant further reported that the subject drove a green Cadillac automobile (T2: 203-04; T3: 83, 86).

5. The confidential informant provided the information regarding "Skip" in exchange for "consideration" in his own federal criminal drug case (T3: 87).

---

[1] Each session of the evidentiary hearing resulted in a separate volume of transcript which are designated T1 (December 17, 2007), T2 (January 25, 2008) and T3 (April 4, 2008).

6.  Malagrida utilized the Law Enforcement Information Network ("LEIN"), Michigan Secretary of State records, a DEA intelligence data base, a Michigan State Police data base and public information sources to associate the Iowa Street address with Clinton Carl Campbell, age 45 (T2: 204; T3: 87, 93).

7.  Malagrida obtained a driver's license photograph of Campbell which matched the description obtained from the confidential informant (T2: 204).

8.  The informant identified the person depicted in the photograph as "Skip" (T2: 204).

9.  Malagrida performed a criminal history check on Campbell, which revealed "more than one" drug felony (T2: 204).

10.  Malagrida utilized the confidential informant in the conduct of a controlled purchase of drugs from "Skip," in late August or early September 2007, and drugs were recovered from that transaction (T3: 87, 91-92).

11.  The controlled drug purchase was undertaken to corroborate the confidential informant's information, which had been based upon reports from other persons as well as the informant's personal knowledge and observations (T3: 91).

12.  An official Drug Enforcement Administration report ("EEA-6") was prepared with regard to the controlled drug purchase, but not disclosed to counsel for the defense (T3: 92).

13.  The confidential informant informed Malagrida that "Skip" was selling drugs to others (T3: 92), but did not provide the names, dates or other details of such transactions (T3: 93).

14.  Surveillance of 6700 Iowa Street, Detroit, by Malagrida and others before September 14, 2007 yielded no evidence of unlawful activity (T3: 96-100).

15.  On September 14, 2007, Malagrida decided to convene a briefing with members of a joint State-Federal Violent Crime Task Force, at its headquarters in Detroit (T3: 104).

16.  The attendees included Wayne County Sheriff's Department ("WCSD") Deputies Lilly and Smith, whose intended role in the investigation of Defendant was to remain available as uniformed officers in a semi-marked car to perform a traffic stop if requested to do so (T3: 100-03).

17.  Lilly and Smith were told that the task force was conducting a narcotics investigation, and that Campbell was the target.  No other targets or specific locations were discussed (T3: 101-03).

18.  Campbell was not the only person mentioned as a suspect at the task force meeting, but Lilly was told that he would be focused on Campbell, and that the Defendant would be driving a green Cadillac.  Lilly was given the license number and informed of the possibility that drugs might be present in the vehicle (T1: 87; T2: 7-8).

19.  Malagrida did not discuss with Lilly/Smith what would occur at the traffic stop; or the concepts of plain view or consent search; or the employment of a narcotics detection dog (T3: 103).

20.  Malagrida told the assembled task force members that the target of this investigation was Campbell, aka "Skip."   He displayed Defendant's photograph and reviewed his criminal history.  Malagrida explained that Campbell was a "hit" as a drug trafficker in DEA intelligence data.  He relayed the report of the confidential informant that "Mr. Campbell was a multi-ounce quantity of cocaine dealer who just recently hooked up

with a supply of a couple of kilogram quantities of cocaine which he was offloading for approximately $25,000 per kilogram." Finally, Malagrida informed the officers that he believed a large drug transaction was going to occur that day (T2: 202-203).

21. Task Force members commenced surveillance at the Iowa Street address at approximately 1:20 in the afternoon of September 14, 2007 (T2: 204-05).

22. At approximately 1:45 p.m., Hartman observed Defendant and a female individual (Quentisha White) enter a green Cadillac which was parked in front of the residence (T2: 163-64).

23. The green Cadillac was followed to 12666 Mendota Street, Detroit, where it was seen by Sargent Mendoza to enter the driveway (T2: 70-73, 205).

24. Because Mendoza was conducting a moving surveillance, he was required to pass by, turn around and wait for a few minutes before he could return to the Mendota address (T2: 70-73 Mendoza; T2: 205-06 Malagrida).

25. Upon his return to the Mendota location, Mendoza observed the Cadillac backing out of the driveway, although he was unable to observe the occupants. Mendoza radioed his observations to other Task Force members (T2: 72-74).

26. Based upon Task Force radio traffic, Special Agent Paul Sorce, who was not in a position to observe the Mendota address, estimated that the Cadillac remained there for three to four minutes (T1: 24-25 Sorce).

27. Special Agent Sorce took up the surveillance, following the Cadillac from Mendota Street. He remained behind the vehicle, and notified other units of its location (T1: 25).

28. Task Force Agents suspected that Campbell had received drugs at the Mendota address, despite the fact that no one was observed moving between the residence and the Cadillac. Special Agent Malagrida based his conclusion upon: (a) information obtained from the confidential source; (b) observations of surveillance officers; and (c) Defendant's prior history of drug trafficking (T1: 83 Sorce; T2: 95-96 Mendoza; T2: 207 Malagrida).

29. An order was given by radio that the green Cadillac should be subjected to a traffic stop (T2: 207 Malagrida; T1: 82 Sorce; T2: 111-12 Farris; T3: 111-13 Malagrida).

30. At some point, a WCSD vehicle passed Sorce's car and stopped the Cadillac at Santa Rosa and Buena Vista Streets (T1: 25).

31. Based upon the Task Force briefing, Deputy Lilly understood that his role in the investigative plan was to perform a traffic stop if requested to do so (T1: 100; T2: 7).

32. The plan was formulated by Special Agent Malagrida, and the purpose of the traffic stop was to recover drugs (T1: 102; T2: 7).

33. Lilly was not assigned to traffic enforcement duties on September 14, 2007 (T1: 118).

34. Lilly and his partner (Smith) were in a semi-marked Sheriff's vehicle equipped with lights and siren (T1: 116).

35. Lilly and Smith were wearing black WCSD uniforms (drug unit) bearing department patches (T1: 86, 117-18).

36. Lilly and Smith received instructions by radio to effect a traffic stop (T1: 87, 99, 102-03; T2: 10).

37. Lilly was on Santa Rosa Street, near Fullerton Street, when he received the instructions (T2: 11).

38.  Lilly first saw the Cadillac northbound on Santa Rosa (T1: 104).

39.  Lilly cannot identify the person who gave the order over the radio, nor can he recall the exact words of his instructions (T2: 10).

40.  There were multiple surveillance vehicles involved in the plan, and Lilly/Smith passed one of those to get behind the Cadillac (T2: 12-13).

41.  Lilly followed Campbell's vehicle approximately one block before pulling it over after Defendant failed to signal a turn at Buena Vista and Santa Rosa, at approximately 2:20 p.m. (T1: 87-88, 106, 121; T2: 14).

42.  At the time of the traffic stop, Defendant Campbell was the driver of the Cadillac, and the female subject was the passenger (T1: 89).

43.  Based on the information he received at the briefing, Lilly approached the Cadillac with his sidearm drawn and held at the back of his leg.  At no time was the weapon pointed at anyone (T1: 107-09).

44.  As Lilly approached the vehicle on foot, he observed the female in the passenger seat move her left leg in a backward motion.  Based on his prior experience, Lilly concluded that she was "hiding something"  (T1: 89, 112-13; T2: 14-15).

45.  Lilly asked Campbell for his driver's license, registration and proof of insurance. As Campbell produced the items, Lilly observed that he was "shaking uncontrollably" in a manner suggesting that he was "more than nervous" (T1: 89, 109-10).

46.  Lilly asked Campbell if he was "OK" (T1: 89, 110).

47.  Campbell responded that he "gets nervous" whenever police pull him over (T1: 90, 111).

48.  Lilly had seen persons exhibit nervousness during traffic stops, but "not shaking like that though" (T1: 111).

49.  Campbell asked what he had done wrong, and Lilly explained the failure to signal a turn (T1: 90).

50.  Lilly inquired of Campbell if there was "anything in the vehicle that I need to know about," and Campbell asked what he meant.  Lilly then rephrased his question to inquire if any guns or drugs were in the vehicle.  Campbell's answer was "No, I don't think so." (T1: 90, 111).

51.  Lilly looked into the vehicle for suspicious objects, but saw none (T2: 15).

52.  Lilly asked for permission to search the vehicle (T1: 90, 112; T2: 14-15).

53.  Campbell denied permission to search (T1: 90, 112).

54.  Lilly informed Campbell that he was going to summon a canine unit (T1: 115).

55.  Lilly called for a canine unit by telephone, to determine if drugs were in the vehicle (T1: 90, 115; T2: 15).

56.  At that point, Campbell was not free to go, and Lilly took his car keys to prevent him from driving away (T1: 122; T2: 114).

57.  Deputy Smith monitored the vehicle while Lilly returned to the police car to process a LIEN inquiry (T1: 90-91).

58.  Lilly called for the canine unit approximately 4 to 5 minutes after the traffic stop was effected (T1: 115-16).

59.  The canine unit arrived at approximately 2:40 p.m., after an estimated 15 to 20 minute delay (T1: 120-21).

60.  The dog handler was Corporal Dave Rahn, WCSD (T1: 122; T2: 16).

61.   Upon Rahn's arrival, the windows of Campbell's vehicle were rolled down on both sides (T2: 17).

62.   Rahn informed Lilly that White and Campbell must either roll up the windows or exit the vehicle because the dog was "aggressive" and could jump through the window and injure any occupants of the car (T1: 123-24; T2: 17).

63.   Lilly directed Campbell and White to get out of the car "when they didn't roll up the windows," and both complied (T1: 125; T2: 17).

64.   Campbell and White went to a position behind their vehicle and in front of Lilly's. They were not free to leave at that point (T1: 125).

65.   Lilly watched as Rahn and the drug detection dog investigated the exterior of the Cadillac (T1: 126; T2: 19).

66.   Lilly saw the dog scratch "uncontrollably" at the driver's side door (T1: 127; T2: 20).

67.   Rahn informed Lilly that the dog was alerting to the vehicle (T2: 20).

68.   Lilly heard Rahn address Campbell.  Rahn asked Campbell if anything was in the vehicle that he needed to know about.  That communication occurred before Campbell was advised of his Miranda rights (T1: 127-28; T2: 21).

69.   Campbell responded that he had been smoking marijuana earlier that day (T1: 128; T2: 19, 21).

70.   Lilly placed Campbell in handcuffs, based upon: (a) the dog alert to the vehicle; (b) Campbell's statement regarding marijuana use; and (c) the gesture by the female passenger (T1: 129-130).

71.   Lilly believed that there were narcotics in the vehicle (T2: 23).

9

72.  Corporal Rahn opened the driver's door of the Cadillac, and the narcotics dog jumped into the vehicle (T2: 23).

73.  Lilly observed the dog scratching in the area of the passenger seat.  Rahn advised Lilly that the dog was "hitting" in that area (T2: 24).

74.  Lilly observed an object sticking out from under the passenger seat, and he retrieved the object (T2: 24).

75.  The object consisted of a white, brick shaped material in brown packaging, partially protruding from a black plastic bag (T2: 25-27).

76.  The material was field tested and seized as suspected cocaine (T2: 44).

77.  Lilly reported to the Task Force that a kilogram of possible cocaine had been seized from the Cadillac (T2: 45).

78.  Campbell was taken to a police facility, advised of his Miranda rights, and interviewed by Lilly (T2: 28-30).

79.  Lilly did not issue a traffic citation based upon Campbell's improper turn (T1: 119; T2: 14).

80.  The purpose of Lilly's stop of Campbell's vehicle was not traffic control, but to determine if drugs were in the car (T3: 114, Malagrida; T2: 14 Lilly).

**C.  <u>Analysis</u>**

Defendant Campbell seeks to suppress as evidence the kilogram of cocaine seized from his vehicle by Deputy Lilly on September 14, 2007.  He further moves for suppression of his subsequent inculpatory statements.  He offers a number of arguments in support of his position.  His arguments may be summarized as follows:

1.  The initial stop of Defendant was unlawful because: (a) he did not commit a traffic violation, and (b) there was no independent reasonable suspicion or probable cause to support the stop.

2.  The seizure of Defendant Campbell after the stop ripened into an arrest without probable cause.

3.  In view of 1 and/or 2, the subsequent search of the vehicle was unlawful, and any evidence seized must be suppressed.

4.  Defendant's subsequent inculpatory statements were the product of his illegal detention/arrest and must also be suppressed.

## 1.    Initial Stop was Unlawful

The Fourth Amendment to the Constitution of the United States guarantees "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures."  U.S. Const., Am. IV.  When an officer, by force or show of authority, has restrained the liberty of a citizen such that, in view of all the circumstances surrounding the incident, a reasonable person would believe that he was not free to leave, a seizure has occurred.  U.S. v. Mendenhall, 446 U.S. 544, 554-55 (1980).  The temporary detention of an individual during a police stop of a vehicle, regardless of the limited purpose or the duration constitutes a "seizure" within the meaning of the Fourth Amendment.  Whren v. United States, 517 U.S. 806, 809-10 (1996); Delaware v. Prouse, 440 U.S. 648, 653 (1979).  The stop of an automobile is reasonable, however, if police have probable cause to believe that a traffic offense has occurred.  Id.  Where such probable cause exists, the subjective intentions of the officer play no role in ordinary Fourth Amendment probable cause analysis.  The Court rejected "the idea that an ulterior motive

11

might serve to strip the agents of their legal justification." Id. at 813.  Even before Whren was decided, the Sixth Circuit held that, so long as an officer had probable cause to believe that a traffic violation had occurred, a resulting stop would be lawful, regardless of what else the officer knew or suspected about the traffic violator at the time of the stop.  United States v. Ferguson, 8 F.3d 385, 391 (6th Cir. 1993), cert. denied, 513 U.S. 828 (1994). Case law since Whren has reaffirmed the proposition that an officer who has probable cause to believe a civil traffic violation has occurred may stop the vehicle regardless of his or her subjective motivation for doing so.  United States v. Akram, 165 F.3d 452, 455 (6th Cir. 1999).

In the case at bar, the evidence amply demonstrates that the subjective motivation underlying Officer Lilly's stop of Campbell's vehicle was the furtherance of the drug investigation by the Violent Crime Task Force.  That fact alone, however, will not establish a violation of Campbell's Fourth Amendment rights if Lilly had probable cause to believe a civil traffic violation had occurred.

The sworn testimony of Deputy Burnon Lilly constitutes direct evidence that Campbell failed to signal a turn at the intersection of Santa Rosa and Buena Vista Streets. That evidence, if believed, is sufficient in law to establish the fact of the unsignaled turn. Defendant Campbell maintains that Lilly's testimony regarding the traffic violation is "unreliable" and uncorroborated.  He advances several points in support of that argument.

Campbell correctly observes that a traffic stop of Campbell's vehicle was incorporated into the investigative plan outlined by agent Malagrida hours before the Defendant was stopped.  He further notes that Lilly (and Smith) had no surveillance role and remained in stand-by mode until notified that a traffic stop should be effected.

12

Campbell also correctly points out that Lilly was not assigned to traffic enforcement duties on the day in question, and that he admitted that the motivation underlying the traffic stop was the furtherance of a drug investigation. (Plaintiff's Brief, pages 15-17). Those factual assertions, while accurate, do not negate the fact of an unsignaled turn. There is no doubt that Lilly and Smith, as Wayne County Deputy Sheriffs, had traffic enforcement jurisdiction, whether or not they were particularly assigned to traffic duties. Defendant himself observes that they had no other active role in the drug investigation, which suggests that their traffic enforcement authority was the sole basis for their involvement in the project. Although Lilly admits to stopping Campbell to advance the drug investigation, Whren and its progeny render any ulterior motive irrelevant, so long as a traffic violation occurred.

Campbell notes that Lilly followed him for only one block before the traffic stop was made. Once again, that correct statement of the record fails to undermine Lilly's sworn testimony. Unsignaled turns are a common occurrence. While the exact words of the signal to Lilly are not part of the record, there is testimony that the investigative plan did not contemplate a traffic stop in the absence of an observed violation (T3: 115-16 Malagrida; T1: 79-80, 82 Sorce).

Campbell emphasizes that no agent witness other than Lilly testified to having observed an improper turn. He notes in particular that Special Agent Sorce was "in the immediate area of the alleged violation" but did not observe it. (Defendant's Brief, page 16). Sorce, however, is a Federal Bureau of Investigation Agent. There is no evidence that he has had any training or experience in traffic enforcement, or any particular familiarity with the Michigan Civil Code. It is abundantly clear that Agent Sorce was not assigned any role in relation to a traffic offense. Even more important, Sorce testified that Lilly's vehicle

13

was between Campbell's and his, such that he (Sorce) was not in a position to see whether or not a traffic violation occurred at Buena Vista and Santa Rosa Streets (T1: 48). There is no evidence in the record that any other investigating agent was in a position to observe a traffic violation at that time and place. It is not correct to say, however, that there was absolutely no corroboration of Lilly's observation. Both Sorce and Task Force Agent Farris testified to contemporary radio transmissions announcing Lilly's observation of a traffic violation (T2: 112 Farris; T1: 48 Sorce). Sorce specifically recalled hearing that a failure to signal had been observed (T1: 48). Farris also believed that the radio call announced a failure to use a turn signal, but he was not positive on that detail (T2: 112).

Campbell further attempts to buttress his argument by observing that no traffic citation was issued for his failure to signal. While the observation is accurate, it is neither surprising nor illogical that no ticket was issued. In his dissenting opinion in <u>Akram</u>, Judge Guy wrote that he knew of no similar case in which a traffic violation notice had ever been issued. While he found that circumstance troublesome, the majority opinion did not. I share the latter view. When a motorist known to have been convicted of a drug related felony is found to be in possession of a kilogram of cocaine, it is not surprising that law enforcement personnel might elect to forego the issuance of a traffic citation for a civil infraction. In fact, there is something almost comically anticlimactic about capping an arrest for a federal felony narcotics trafficking offense, carrying a statutory penalty of 10 years to life imprisonment and a $4,000,000.00 fine, with a state civil infraction summons for failing to signal a turn. The issuance of a citation is not evidence of a violation. Nor is the lack of a ticket evidence that a violation did not occur. Should courts insist upon the writing of a ticket, police agencies will surely issue them, but to no good effect. An officer willing to

14

testify to a traffic offense would surely not balk at writing a citation to buttress his story. The citation will be as genuine as the testimony, but will be of no use in determining credibility.

Finally, Defendant claims that Lilly "contradicted himself about where he first followed Campbell and where the traffic stop and alleged violation occurred." (Defendant's Brief, page 17). It does appear that Lilly mis-spoke himself. Nonetheless, there is no real doubt that the sheriff's deputy undertook the pursuit of Campbell on Santa Rosa Street and based his stop upon an unsignalled turn onto Buena Vista. Those facts are established in other statements by Lilly, as well as the testimony of Agent Sorce who was clear as to the locations. I do not find that the isolated misstatement as to location undermines Lilly's credibility as to the traffic violation. Inconsistencies and incongruities in the testimony of witnesses, in the absence of evidence tending to undermine their veracity, should be reconciled when possible. "If the testimony is irreconcilable, the presumption of reason as well as law, will impute the variance to an innocent misconception rather than to a willful and corrupt misrepresentation." See The Seeandbee, 102 F.2d 577 (6th Cir. 1939). Aside from Lilly's isolated error, Defendant's entire attack upon his credibility is based upon an absence of corroboration, and not upon the existence of contradictory evidence. There is no evidence in the record that Campbell did not fail to signal his turn at the intersection of Santa Rosa and Buena Vista Streets. In the absence of any contradictory evidence, the court in Akram found no basis upon which to reject the district court's acceptance of the arresting officer's testimony. 165 F.3d at 456. Similarly, in the absence of any contradictory evidence, I accept Lilly's sworn account of his encounter with Campbell as credible. As I find that a traffic violation did occur, I am satisfied that Lilly's traffic stop of

15

Campbell's vehicle was justified and lawful. No violation of the Defendant's Fourth Amendment rights occurred by reason of the fact that Lilly's intent in making the stop was to advance a drug investigation.

## 2. Seizure of Defendant After Traffic Stop Ripened into Arrest Without Probable Cause

Assuming, for purposes of his argument, that a traffic violation occurred, Defendant maintains that any detention beyond that necessary to conduct an investigation of the civil traffic infraction must be supported by reasonable suspicion of more extensive criminal conduct. United States v. Townsend, 305 F.3d 537 (6th Cir. 2002). The record reflects that Lilly asked Defendant to produce his driver's license, registration and proof of insurance. Those documents were produced, and appeared valid on their face. Defendant argues that the officer was then "able to confirm the information and could either issue a warning or citation," and that any detention "beyond that purpose" was unlawful.

The validity of Campbell's argument may be reasonably questioned, based upon a recent decision of the Supreme Court in Virginia v. Moore, 553 U.S.      (2008). In that case, police arrested a motorist for a traffic offense which, under state law, was not an arrestable offense but one which would warrant only the issuance of a summons. A search incident to the arrest led to the seizure of illegal drugs, for the possession of which the defendant was subsequently charged and convicted. The Virginia Supreme Court reversed, reasoning that the arresting officer should merely have issued a citation, and that a search subsequent to the defendant's arrest was a violation of his Fourth Amendment rights. The Supreme Court of the United States reversed the Virginia Supreme Court, holding that when an officer has probable cause to believe a person committed even a

minor crime in his presence, an arrest is constitutionally permissible, even if state law prescribes a more restrictive search and seizure policy. The arrest offense in <u>Moore</u> was a misdemeanor, as opposed to the "civil infraction" for which Campbell was stopped. Whether or not the violation in question here was a "minor crime" for Fourth Amendment purposes remains unclear. I am satisfied that it was. Even if it was not, however, the actions of the law enforcement officers in this case can be justified on grounds separate and distinct from those upon which the <u>Moore</u> decision was based.

Defendant acknowledges Lilly's testimony that Campbell was shaking uncontrollably while providing his documents - to the point that the deputy inquired as to his medical condition. Campbell responded that he was alright, and indicated that he gets nervous when confronted by the police. The defense concedes that nervousness is a factor to consider in determining the existence of reasonable suspicion, but emphasizes that it is insufficient, in itself, because there are many innocent explanations for nervousness in the presence of the police. Campbell contends that he gave Lilly a logical and reasonable explanation for his nervousness that would dispel any suspicion. He further argues that his nervousness was heightened by the fact that Lilly approached his car with his weapon drawn. As to the latter point, however, the unrebutted testimony is that Lilly concealed the firearm behind his trouser leg. There is no evidence in the record that Campbell, or his passenger, was even aware that the weapon was drawn. There was certainly no mention of it in the testimony regarding the conversation between Lilly and Defendant. Although Lilly admitted to observing other persons who exhibited nervousness in his official presence, he testified that none had exhibited the level of distress displayed by Campbell. While nervousness in the context of a traffic stop has been described as an unreliable

indicator in support of reasonable suspicion, <u>United States v. Saperstein</u>, 723 F.2d 1221, 1228 (6th Cir. 1983), it is reasonable to conclude that an extraordinary display of nervousness would elevate the level of suspicion that more than a traffic infraction gave rise to it.

Campbell's brief does not address the role that his passenger's conduct played in arousing the deputy's suspicion. Lilly testified that, upon his approach to the Cadillac, he observed the Defendant's female passenger (White) move her leg two or three times toward the car seat "like she was kicking something." It appeared to Officer Lilly as though she were attempting to hide something. In the context of the information received by Lilly at the task force briefing earlier that day, the officer's conclusion was certainly reasonable, despite the fact that he did not actually observe contraband.

When asked by Deputy Lilly whether drugs or weapons were in his vehicle, Campbell responded "No, I don't think so." That response, in the context of Lilly's task force briefing, and his on scene observations, did little to resolve suspicion.

> The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common sense conclusions about human behavior; jurors as fact finders are permitted to do the same - - and so are law enforcement officers. Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.

<u>United States v. Cortez</u>, 449 U.S. 411, 418 (1981). Deputy Lilly and his partner had received information in the task force briefing that Campbell (aka "Skip") was a convicted drug trafficker and the target of an active task force investigation. They were exposed to his photograph and criminal history. They learned that Campbell was identified as a

18

trafficker in DEA intelligence information as well as by a confidential informant. They learned that the informant reported that Campbell had just received a multi-kilogram quantity of cocaine which he was distributing, and they were also told that Malagrida believed a significant transaction would occur that day. The deputies were told to stand by for a signal to follow the Cadillac and stop it for any observed traffic violations. They were further told that drugs might be in the vehicle. It is in that context that Deputy Lilly effected a traffic stop and approached Campbell and his companion. It is in that light that he observed Campbell's extraordinary nervousness and his companion's apparent effort to conceal something within the vehicle. I am satisfied that, under the circumstances described in the evidence, Lilly had reasonable suspicion that a drug trafficking violation was occurring, and that he was fully justified in briefly detaining the two suspects until a drug detection dog could be summoned.

Where law enforcement officers have reasonable suspicion of unlawful narcotics trafficking, the permissible scope of an investigative stop of a vehicle is not exceeded by exposure of the vehicle to a drug detection dog within a half hour of the initiation of the stop. "[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." United States v. Davis, 430 F.3d 345, 354 (6th Cir. 2005) (quoting Florida v. Royer, 460 U.S. 491, 500 (1983). The scope of activities conducted during an investigatory stop "must be reasonably related to the circumstances that initially justified the stop." United States v. Richardson, 949 F.2d 851, 856 (6th Cir. 1991). To detain the motorist any longer than is necessary to issue the traffic citation requires reasonable suspicion that the individual has engaged in more extensive criminal conduct. United States v. Townsend, 305 F.3d 537, 541 (6th Cir. 2002). The reasonable

suspicion required for continued investigatory detention, however, is not as demanding a standard as the probable cause required for a search.  Id.  Upon approaching Campbell and his companion following the traffic stop, Deputy Lilly observed circumstances which, in combination with information obtained earlier at the task force briefing, gave rise to reasonable suspicion that Defendant and his passenger were engaged in a drug trafficking offense.  Exposure of a drug detection dog to the vehicle was a reasonable measure for promptly resolving that suspicion.  The canine sniff procedure does not intrude upon a person's reasonable expectation of privacy, and does not constitute a search within the meaning of the Fourth Amendment.  United States v. Place, 462 U.S. 696, 707 (1983); United States v. Reed, 141 F.3d 644, 649 (6th Cir. 1998).  The evidence establishes that Corporal Rahn was summoned within five minutes, and exposed his certified drug detection dog to Defendant's vehicle within 30 minutes of the initial stop.  I conclude, therefore, that the detention of the suspects did not offend the Fourth Amendment.  United States v. Garcia, 496 F.3d 495.

Campbell asserts that, following his refusal to consent to a search of his vehicle, the officers deprived him of his car keys to prevent him from leaving.  He argues that his detention was transformed into an arrest, without probable cause, at that point in time.  It is well established that a traffic stop entails a "seizure" of the driver, in Fourth Amendment terms, even though the purpose of the stop is limited and the resulting detention is brief.  Brendlin v. California, 127 S.Ct. 2400 (2007).  Actions to prevent a vehicle from moving, so its occupant is unable to leave during the course of an investigatory stop are reasonable measures to maintain the status quo while pursuing the purpose of the stop.  See United States v. Tuley, 161 F.3d 513, 515 (8th Cir. 1998).  Campbell also complains of his removal

from the vehicle prior to the initiation of the dog sniff procedure. The evidence established that his (and White's) relocation was a measure for the protection of Defendant and his companion from injury by the dog, and to allow the handler to employ the dog immediately and without interference. I am satisfied that the officer's conduct in these respects did not elevate Campbell's status from detainee to arrestee. In Pennsylvania v. Mimms, 434 U.S. 106 (1977), the Supreme Court addressed a situation in which a driver was asked to exit his vehicle for purposes of officer safety.

> Against this important interest we are asked to waive intrusion into the driver's personal liberty occasioned not by the initial stop of the vehicle, which was admittedly justified, but by the order to get out of the car. We think this additional intrusion can only be described as de minimus. The driver is being asked to expose to view very little more of his person than is already exposed. The police have already lawfully decided that the driver shall be briefly detained; the only question is whether he shall spend that period sitting in the driver's seat of his car or standing along side it. Not only is the insistence of the police on the latter choice not a serious intrusion upon the sanctity of the person, but it hardly rises to the level of a petty indignity. What is at most a mere inconvenience cannot prevail when balanced against legitimate concerns for the officer's safety.

Pennsylvania v. Mimms, 434 U.S. at 111. In the case at bar, the considerations giving rise to Lilly's direction that Campbell and his passenger exit the vehicle were the Defendant's safety and the expeditious completion of the narcotics dog sniff process. Each is an important interest in its own right, and their combined importance more than warrants the minimal intrusion of which Campbell complains. Furthermore, Lilly testified that he offered Campbell and White the option of remaining in the vehicle so long as they rolled up the windows. For whatever reasons, Defendant and his passenger neglected to exercise either

option.[2]  Only then did Lilly direct them to get out of the car and stand behind it.  Neither Campbell nor White was subjected to any form of physical touching or restraint prior to the point at which the canine alerted to the vehicle.  At that point, the officers had probable cause to believe that controlled substances were located within it.  The warrantless search of the Cadillac was then sufficiently justified.  United States v. Hill, 195 F.3d 258, 273 (6th Cir. 1999) (An alert by a properly trained and reliable dog establishes probable cause for a warrantless search of a stopped vehicle).

I reject as well Defendant's suggestion that the exposure of the canine to the interior of his vehicle was unlawful because Defendant's admission of marijuana use earlier that day sufficiently explained the dog's alert to the exterior of the car.  It is well established in our circuit that a probable cause determination does not require that every contrary hypothesis be excluded.  United States v. Wagers, 452 F.3d 534, 542 (6th Cir.), cert. denied, 127 S.Ct. 596 (2006).  In the instant case, the application of that well established concept is unnecessary, since Campbell's "explanation" for the positive dog alert was his own recent drug possession in the vehicle.  Far from undermining a finding of probable cause, Defendant's statements to Officer Rahn merely confirmed the accuracy of the dog's reaction and provided a basis for the reasonable conclusion that evidence of drug involvement might remain in the car.  Exposure of the canine to the interior of the vehicle was fully appropriate to the circumstances.

---

[2]  In United States v. Lewis, 2005 WL 35555502 (W.D. MI), Judge Quist denied a motion to suppress evidence in a case in which a traffic violation detainee was physically removed from his vehicle after refusing to get out so that a drug detection dog could be employed.

In its Supplemental Brief, the government argues that, independent of a valid traffic stop, there was probable cause: (a) to arrest Campbell based upon prior criminal activity; and/or (b) to believe that controlled substances were in the car. For the reasons discussed in the foregoing sections, I view these arguments as superfluous. Nonetheless, Defendant did respond to them, and I am satisfied that they should be addressed.

The government relies upon the "totality of the circumstances" concepts enunciated in <u>Illinois v. Gates</u>, 462 U.S. 213 (1983). The prosecution observes that agents involved in the investigation of this Defendant were aware of his criminal record of conviction for drug distribution activities. They were possessed of information from an informant that Campbell would be involved in drug activities at or near the time in question. Agents were aware that Defendant had been involved in the delivery of drugs to the confidential informant within the previous two weeks. That activity not only tended to confirm the accuracy of the informant's information, but also established recent criminal activity on Campbell's part. Finally, the agents had knowledge of Campbell's surveilled movement from Iowa Street to 12666 Mendota, where he remained only three to five minutes before driving away.

Agent Malagrida's unrebutted testimony established that the controlled purchase of drugs by the confidential informant from Campbell was surveilled by agents of the Violent Crime Task Force and that the controlled substances had been recovered. Based on those facts, the agents had probable cause to arrest Campbell for a felony drug distribution offense. It is well settled that police may arrest a person in a public place, even without a warrant, so long as they have probable cause to believe that the individual has committed a crime. See <u>United States v. Watson</u>, 423 U.S. 411, 423-24 (1976). It is clear as well that

officers may make a warrantless arrest, even though adequate opportunity existed to procure a warrant after developing probable cause.  United States v. Wright, 16 F.3d 1429 (6th Cir. 1994).  Furthermore, "[t]here is no constitutional infirmity in arresting a defendant where probable cause to make the arrest exists and the purpose of the arrest is to facilitate an otherwise lawful search."  United States v. Francis, 646 F.2d 251 (6th Cir. 1981).  Finally, it is not necessary that the officer actually performing an arrest have knowledge of all the facts and circumstances giving rise to probable cause.  Rather, probable cause for arrest may be founded upon collective police knowledge.  See United States v. Calandrella, 605 F.2d 236, 246 (6th Cir. 1979), United States v. Killebrew, 594 F.2d 1103, 1105 (6th Cir. 1979), United States v. McManus, 560 F.2d 747, 750-51 (6th Cir. 1977), cert. denied, 434 U.S. 1047 (1978).  In the case at bar, Deputies Lilly and Smith became participants in the Violent Crime Task Force investigation prior to the contact with Campbell.  They had learned a substantial amount of information about the Defendant's background and the other facts assembled by Agent Malagrida and his organization.  While there is no evidence that Lilly and his partner were aware of the recent sale of drugs by Campbell to the informant, that information was clearly within the collective knowledge of the task force.

Even in circumstances in which an arresting officer has nothing more than a bulletin from another police organization that a person is suspected of a criminal offense, an investigatory stop of the subject would be constitutionally justifiable by objective reliance on the bulletin, so long as the police who issued it possessed a reasonable suspicion justifying the stop.  United States v. Hensley, 469 U.S. 221 (1985).

Defendant in the case at bar offers no authority contrary to those cited above.  He merely argues that the government may not assert its collective knowledge as establishing

24

probable cause/reasonable suspicion for Defendant's arrest/investigatory detention because the witnesses involved have "explicitly testified that the vehicle <u>would not have been stopped without a traffic violation</u>." (Defendant's Brief, Page 22). Citing <u>United States v. Townsend</u>, 305 F.3d 537 (6th Cir. 2002), Campbell maintains that the government, having relied on a traffic violation as the basis for its action, "cannot not claim a different basis to support the stop that the police did not rely on." The argument has two weaknesses. First, it is inaccurate, in my view, to state that the investigative information amassed by the task force was not relied upon in bringing about Defendant's apprehension. Based on the testimony, I conclude that the signal calling for Lilly and Smith to make a traffic stop was based upon the events observed during the task force surveillance <u>in the context of all the information they had uncovered in the course of their investigation</u>. That body of information certainly included the controlled purchase of drugs from Campbell by the informant in the preceding two week period. Second, there is authority for the proposition that, even where a traffic stop is subsequently invalidated, suppression of evidence found in the vehicle was not required if information within the collective knowledge of the requesting authority would have warranted an investigative stop based on reasonable suspicion, during which the narcotics dog employed during the (invalid) traffic stop could have been employed to the same effect. See <u>United States v. Ramirez</u>, 473 F.3d 1026 (9th Cir. 2007).

"Reasonable suspicion" and "probable cause" are legal conclusions ultimately within the proper province of the court. They exist, or not, regardless of the subjective mindset of the officers on the scene of a search or seizure. Whether an officer is doubtful or confident of the constitutionality of his actions does not finally determine the issue. That

he took action on a faulty theory of law does not render his work for naught if his conduct was justifiable on the same facts under a correct theory not within his contemplation at the time he acted. I am satisfied that, at the very least, the information within the collective knowledge of the Violent Crime Task Force would have warranted an investigative stop based upon reasonable suspicion of drug distribution activity. It is logical to conclude that any such stop would have afforded Deputy Lilly the same observations of nervousness and furtive movement which prompted his employment of the canine narcotics detection unit.

### 3.    Inculpatory Statements Resulted From Illegal Detention/Arrest

Defendant Campbell challenges the government's use of his incriminating statements made while he was "interviewed" by Deputy Lilly. The sole argument in support of that challenge is that the statements were obtained through the exploitation of an unlawful detention and arrest.

> The general remedy for a Fourth Amendment violation is that evidence obtained due to the unconstitutional search or seizure is inadmissible. The scope of evidence to be excluded sweeps broadly, including both evidence obtained as a direct result of an unconstitutional search or seizure, as well as evidence that is considered the fruit of a prior illegality that was come at by exploitation of the prior illegality.

United States v. Dice, 200 F.3d 978, 983 (6th Cir. 2000).

As stated in the previous sections of this Report, I am satisfied that the tangible evidence recovered as a consequence of the traffic stop of Campbell and his passenger on September 14, 2007 is not the product of any violation of his Fourth Amendment rights. The unrebutted testimony of Officer Lilly is that Campbell was advised of his rights under Miranda v. Arizona, 384 U.S. 436 (1966). The same witness testified that Campbell

voluntarily waived those rights and offered the statements in question. I find no basis upon which to recommend suppression of his incriminating disclosures.

For all of the above reasons, I recommend that Defendant Cardell Clinton Campbell's Motion to Suppress Evidence be denied.

III.   **NOTICE TO PARTIES REGARDING OBJECTIONS:**

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. Section 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. United States v. Walters, 638 F.2d 947 (6th Cir. 1981), Thomas v. Arn, 474 U.S. 140 (1985), Howard v. Secretary of HHS, 932 F.2d 505 (6th Cir. 1991). Filing of objections that raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. Smith v. Detroit Federation of Teachers Local 231, 829 F.2d 1370, 1373 (6th Cir. 1987), Willis v. Secretary of HHS, 931 F.2d 390, 401 (6th Cir. 1991). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall not be more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

s/Donald A. Scheer
DONALD A. SCHEER
UNITED STATES MAGISTRATE JUDGE

DATED: September 23, 2008

**CERTIFICATE OF SERVICE**

I hereby certify on September 23, 2008 that I electronically filed the foregoing paper with the Clerk of the Court sending notification of such filing to all counsel registered electronically. I hereby certify that a copy of this paper was mailed to the following non-registered ECF participants on September 23, 2008. **None.**

s/Michael E. Lang
Deputy Clerk to
Magistrate Judge Donald A. Scheer
(313) 234-5217