UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff(s),         CASE NUMBER: 07-20472
                                                HONORABLE VICTORIA A. ROBERTS

v.

CARDELL CLINTON CAMPBELL,

        Defendant(s).
_____/

**ORDER ADOPTING THE MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION**

**I.    INTRODUCTION**

This matter is before the Court on Defendant Cardell Clinton Campbell's ("Campbell") "Motion to Suppress and for an Evidentiary Hearing." (Doc. #36). Magistrate Judge Donald A. Scheer granted Campbell's request for an evidentiary hearing. An evidentiary hearing was held on December 17, 2007 and continued on January 25, 2008 and April 4, 2008.

Campbell asks the Court to suppress: (1) the kilogram of cocaine seized by Deputy Burnon Lilly ("Deputy Lilly") of the Wayne County Sheriff's Department; and (2) the inculpatory statements made after the seizure.

On September 23, 2008, Magistrate Judge Scheer issued a Report and Recommendation ("R&R") that recommends the Court DENY Campbell's motion. He says: (1) the traffic stop was lawful; (2) Campbell was detained during the traffic stop, not arrested; (3) the detention did not violate the Fourth Amendment; (4) it was lawful to

1

allow the police dog inside the car to sniff; (5) the seizure of the cocaine did not violate Campbell's Fourth Amendment rights; (6) Deputy Lilly had probable cause to arrest Campbell once the cocaine was seized; and (7) Campbell voluntarily waived his *Miranda* rights before he gave inculpatory statements.

Campbell objects. He says the R&R: (1) improperly finds Deputy Lilly's testimony credible; (2) shifts the burden of proof to Campbell; (3) incorrectly relies on *Virginia v. Moore*, 128 S.Ct. 1598 (2008); (4) incorrectly concludes Campbell was not under arrest before the cocaine was seized; and (5) incorrectly analyzes the admissibility of Campbell's statements based on *Miranda* warnings instead of the "fruit of the poisonous tree" doctrine.

Campbell also says Magistrate Judge Scheer failed to include important facts in the R&R. Those "important facts" are reflected in the following section.

For the following reasons, the Court **ADOPTS** the R&R.

## II. BACKGROUND

### A. Meeting with the Confidential Informant

On August 27, 2007, Special Agent Brian Malagrida ("SA Malagrida") of the Drug Enforcement Administration ("DEA") met with a confidential informant ("CI") at the CI's request.

The CI provided SA Malagrida a physical description of Campbell and told SA Malagrida: (1) Campbell resides at 6700 Iowa Street; (2) Campbell drives a green Cadillac; (3) Campbell's nickname is "Skip"; (4) he did not know "Skip's" real name; (5) Campbell is a multiple-ounce quantity cocaine dealer; (6) he was involved in narcotic

2

deals with Campbell; and (7) Campbell recently received a couple kilograms of cocaine that he was selling for approximately $25,000.00 per kilogram.

The CI did not tell SA Malagrida: (1) the names of the people who allegedly purchased drugs from Campbell; or (2) the dates, times, and places of the alleged drug deals.

The information provided by the CI was based on information he received from other people as well as the CI's own personal knowledge and observations.

SA Malagrida believed the CI's information was reliable because he gave SA Malagrida information in the past that led to the seizure of drugs.

**B.     Follow-Up to Meeting with the Confidential Informant**

After the meeting with the CI, SA Malagrida: (1) identified "Skip" as Campbell; (2) verified that 6700 Iowa Street is Campbell's residence; (3) verified that Campbell drives a green Cadillac (registered to his mother, Alana Turner); and (4) showed the CI Campbell's driver's license picture. The CI identified the person in the photograph as "Skip."

During the last week in August and the first week in September, SA Malagrida conducted drive-by surveillance and spot checks. While the surveillance revealed that a green Cadillac and 6700 Iowa Street existed, SA Malagrida did not see Campbell at 6700 Iowa Street nor did he observe criminal or suspicious activity.

SA Malagrida did not believe the CI's information and his follow-up surveillance were sufficient to arrest Campbell or obtain a search warrant. So, SA Malagrida organized a controlled purchase between the CI and Campbell.

The drugs from that transaction were placed on an evidence tag, but the

controlled purchase was not disclosed prior to the evidentiary hearing. SA Malagrida says he decided not to disclose the controlled purchase to defense counsel because Campbell was not charged with the controlled purchase.

After the controlled purchase, SA Malagrida believed he had probable cause to arrest Campbell. He did not do so.

### C. Briefing on September 14, 2007

On September 14, 2007: (1) Special Agents Paul Sorce ("SA Sorce") and Anthony Hartman ("SA Hartman") of the Federal Bureau of Investigation; (2) Task Force Officers Art Wimmer, Sergeant Benito Mendoza, Everett Monroe, and Deputy Donald Farris; and (3) Wayne County Sheriff Deputy Radkin Smith, along with Deputy Lilly, attended a briefing led by SA Malagrida.

SA Malagrida told the attendees Campbell: (1) was the target of a narcotics investigation; (2) resides at 6700 Iowa Street; (3) drives a green Cadillac; (4) was expected to conduct a large scale drug transaction that day; (5) goes by the nickname "Skip"; (6) has at least one drug conviction; and (7) was identified by the DEA Intelligence Database as a drug trafficker.

SA Malagrida told Deputies Lilly and Smith that an agent would notify them once the surveillance team believed narcotics were in the green Cadillac. While Deputy Lilly was not assigned to traffic enforcement duty on September 14, 2007, Deputy Lilly and Deputy Smith's role was to conduct a "felony" traffic stop to see if, in fact, narcotics were in the car. SA Malagrida instructed them to not conduct a traffic stop until Campbell committed a traffic infraction. Deputy Lilly and Deputy Smith were not part of the surveillance team.

4

SA Malagrida said if Campbell did not commit a traffic infraction, Deputy Lilly and Deputy Smith would not conduct a traffic stop unless the agents received additional information. In that case, the surveillance team would simply continue to watch Campbell.

### D. Surveillance on September 14, 2007

At approximately 1:20 p.m. on September 14, 2007, members of the surveillance team began their investigation at 6700 Iowa Street.

The team observed Campbell exit his residence with Quentisha White ("White"). Neither individual carried anything. This led SA Hartman to believe Campbell and White would pick up drugs from another location.

Campbell and White left 6700 Iowa Street in a green Cadillac. Agents from the surveillance team followed the Cadillac from Iowa Street to 12666 Mendota, a trip that took approximately 18 minutes.

SA Malagrida did not provide information about 12666 Mendota at the briefing because he was unaware of that address.

Campbell and White remained at 12666 Mendota for approximately 3-5 minutes. No one saw: (1) either individual get out of the green Cadillac; (2) anyone approach that car; (3) drugs; or (4) a drug transaction.

Nevertheless, SA Malagrida believed a drug transaction occurred at the Mendota address. SA Malagrida based this belief on: (1) the information he had about Campbell's prior drug dealings; (2) the information from the CI; and (3) Campbell's brief stop at 12666 Mendota.

SA Sorce wanted Campbell stopped before he reached another location because

5

he also believed a drug transaction occurred at the Mendota address.

Sergeant Mendoza initially said Campbell did not engage in suspicious activity during their entire surveillance. Later in the evidentiary hearing, Sergeant Mendoza said that because the surveillance team was following Campbell – whom they believed to be a narcotics trafficker – he found it suspicious that Campbell went to the Mendota address for a short period of time. Sergeant Mendoza believed Campbell picked up what he was supposed to deliver.

SA Hartman did not see Campbell engage in criminal or suspicious activity.

Regardless of what members of the surveillance team saw or did not see, Deputy Lilly was "directed" to "pull over" Campbell.

Deputy Lilly could not recall who gave the order because multiple agents communicated by radio, and Lilly was not familiar with all of them. In his report, Deputy Lilly stated SA Malagrida told him to pull Campbell over. During the evidentiary hearing, however, Deputy Lilly said SA Malagrida told him it was SA Sorce.

### E. Traffic Stop

In response to the order, Deputy Lilly followed directly behind the green Cadillac on Santa Rosa for approximately one block. He then observed Campbell make a right turn onto Buena Vista without using his turn signal.

The Government does not have video surveillance of the alleged traffic infraction because Deputy Lilly's squad car is not equipped with a video camera. The Government also does not have radio transmissions from September 14, 2007. Further, Deputy Lilly did not issue a citation. Only Deputy Lilly and Deputy Smith observed the alleged traffic infraction; no member of the surveillance team observed

6

Campbell commit a traffic infraction during the entire surveillance.

However: (1) SA Sorce was not in a position to see if Campbell committed a traffic infraction; (2) SA Malagrida was a couple of miles away from the surveillance of Campbell; (3) Deputy Farris heard either Deputy Lilly or Deputy Smith say over the radio that he observed Campbell commit a traffic infraction; and (4) SA Sorce heard a radio transmission that a traffic stop would be conducted because Campbell failed to signal.

Campbell denies he committed a traffic infraction.

Deputy Lilly pulled Campbell over on the corner of Santa Rosa and Buena Vista at approximately 2:20 p.m. According to Lilly, the purpose of the traffic stop was to get the drugs SA Malagrida mentioned during the briefing. Lilly testified he did not care about the traffic stop – he wanted to find out what was in the green Cadillac.

When Deputy Lilly approached the car, he held his weapon to the back of his leg. When he reached the driver's side, where Campbell was sitting, he asked Campbell for his license, registration, and proof of insurance. Campbell produced those documents while shaking "uncontrollably." Deputy Lilly "knew that [Campbell] was either very nervous or something was medically wrong with him." Campbell said he shook because he gets nervous when the police pull him over. While Lilly admits it is common for people to become nervous around police, he believed Campbell's nervousness was extreme.

Deputy Lilly said during the evidentiary hearing that he also observed White moving her left leg in a "backing motion" two or three times as if she was hiding or kicking something. Deputy Lilly's report simply says he observed White "moving her left

7

leg."

Deputy Lilly asked Campbell if there were guns or drugs in the car. Campbell replied, "no, I don't think so."

Deputy Lilly did not believe he could order White out of the car for her leg gestures. He also did not have probable cause to search the car because Deputy Lilly did not see drugs "in plain view." Further, Campbell did not consent to a search of the car. Lilly, therefore, called the canine unit to the scene and confiscated Campbell's car keys.

Deputy Lilly said when law enforcement officers are trying to get into a car to see if it contains drugs, it is typical to first make a traffic stop, then try to get consent to search the car. If the officer cannot obtain consent and the drugs are not in "plain view," officers will typically call the canine unit.

### F. Canine Unit at the Traffic Stop

Deputy Lilly says the canine handler, Corporal Dave Rahn of the Wayne County Sheriff's Department, arrived at approximately 2:40 p.m., while he ran a Law Enforcement Information Network ("LEIN") check on Campbell to determine if Campbell had an outstanding warrant (he did not).

Deputy Farris said the canine unit arrived 10-20 minutes after Deupty Lilly completed the LEIN check.

When Corporal Rahn arrived, he told Lilly the occupants in the green Cadillac had to either roll the windows up or step out of the car because his dog, "Chief," was aggressive. Campbell and White stepped out of the car and stood in front of Deputy Lilly's squad car.

Chief began his sniff at the front of the green Cadillac. When he reached the driver's side door, Chief began to scratch and bite at the handle. While Chief has "alerted" to places where no drugs were found in the past, Corporal Rahn says he was positive drugs were in the car when Chief "alerted" because Chief tried to jump through the window three times.

Based on Chief's "alert" and White's leg gesture, Deputy Lilly handcuffed Campbell and placed him in the back seat of his squad car. According to Lilly, Campbell was not under arrest, but handcuffs were necessary and justified because: (1) he had weapons in his squad car; (2) his squad car does not have a cage; and (3) he had reasonable suspicion to believe narcotics were in the green Cadillac.

While Campbell was in Lilly's squad car, Corporal Rahn asked him if there was anything in the green Cadillac he should know about. Campbell said he recently smoked marijuana. Both Deputy Lilly and Corporal Rahn said that is a reasonable explanation for Chief's alert.

Corporal Rahn then opened the driver's door of the green Cadillac so Chief could sniff inside. Chief alerted near the front passenger seat, and Deputy Lilly retrieved a black plastic bag that he says stuck out from under the passenger seat. The bag contained a kilogram of cocaine.

Lilly testified Campbell was not free to go while the traffic stop was being conducted.

### G. Campbell's Interview

Once the cocaine was found, Deputy Lilly read Campbell and White their constitutional rights. At that point, Deputy Lilly believed Campbell was under arrest.

9

Deputy Lilly interviewed Campbell in the presence of Deputy Smith.  Campbell stated the cocaine was inside the car while he went to the movies, out to dinner, and to the store with his girlfriend.  Campbell stated his best friend gave him the cocaine, and he intended to "flip it" for $20,000.00.  Campbell was willing to cooperate, but he was not going to reveal his friend's identity for a reduced sentence.

On September 25, 2007, Campbell was charged with: (1) Conspiracy to Possess with Intent to Distribute and to Distribute Cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 846; and (2) Possession with Intent to Distribute Cocaine, in violation of 21 U.S.C. §841(a)(1).

## III.  APPLICABLE LAW AND ANALYSIS

### A.  Is Deputy Lilly's Testimony that he had Probable Cause to Believe Campbell Committed a Traffic Infraction Credible?

Deputy Lilly's decision to conduct a traffic stop is reasonable and complies with the Fourth Amendment guarantee against "unreasonable" searches and seizures if he had probable cause to believe Campbell committed a traffic infraction.  *See Whren v. United States*, 517 U.S. 806, 810 (1996) (citing *Delaware v. Prouse*, 440 U.S. 648, 659 (1979); *Pennsylvania v. Mimms*, 434 U.S. 106, 109 (1977) (*per curiam*)).  Probable cause means "reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion."  *United States v. Ferguson*, 8 F.3d 385, 392 (6th Cir. 1993) (quoting *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990)).

The Government has the burden to prove the traffic stop was based on probable cause.  *United States v. Walters*, 492 F.Supp.2d 754, 758 (W.D. Mich. 2007) (citing *United States v. Beal*, 810 F.2d 574, 577 (6th Cir. 1987)).  To determine if the

Government met this burden, the Court scrutinizes Deputy Lilly's testimony – in light of the testimony from members of the surveillance team – to see if it is credible. *See United States v. Hill*, 195 F.3d 258, 267 (6th Cir. 1999); *United States v. Akram*, 165 F.3d 452, 455 (6th Cir. 1999).

Campbell asks the Court to discredit Deputy Lilly's testimony because: (1) the traffic stop was only planned and conducted to determine if drugs were in the green Cadillac; (2) Deputy Lilly was not told he should only pull Campbell over if he observed a traffic infraction; (3) Deputy Lilly conducted the traffic stop immediately after ordered to do so; (4) no member of the surveillance team saw a traffic infraction; (5) it is highly unlikely that Campbell did not commit a traffic infraction until the surveillance team wanted the car searched for narcotics; (6) there is no corroboration of Deputy Lilly's testimony; and (7) Deputy Lilly contradicted himself on other issues.

The Court shares Campbell's concern that police officers may lie and say defendants committed a traffic infraction as a pretext to determine whether the car contains contraband. Nevertheless, the Court is not convinced that Deputy Lilly lied about Campbell making an illegal turn.

It does not matter that the traffic stop was ultimately conducted to determine if narcotics were in the car. If probable cause exists, an officer may stop a vehicle for a traffic infraction even when his true motivation for the stop is to search for contraband. *Hill*, 195 F.3d at 264 (citing *Whren*, 517 U.S. at 812-13). The officer's knowledge or suspicions about the traffic violator at the time of the stop is irrelevant. *Ferguson*, 8 F.3d at 391. Simply put, "traffic stops based on probable cause, even if other motivations existed, are not illegal." *Id.* at 392.

The Court declines to find that Deputy Lilly's subjective motivation for the traffic stop means Campbell did not commit a traffic infraction.

While the agent who ordered Deputy Lilly to conduct a traffic stop may not have told him to do so only if he committed a traffic infraction, the evidence shows SA Malagrida informed Deputy Lilly at the briefing that a traffic stop should not be conducted unless he observed a traffic infraction. Deputy Lilly, therefore, was aware he could not stop Campbell absent a traffic infraction.

Deputy Lilly did not stop Campbell immediately after he received the order. He went around another agent's car, got directly behind Campbell, and followed Campbell for approximately one block until he observed a traffic infraction and pulled Campbell over.

Further, the record contains some evidence of corroboration. Deputy Farris and SA Sorce heard either Deputy Lilly or Deputy Smith say over the radio that he observed a traffic infraction and would conduct a traffic stop.

The fact that members of the surveillance team followed Campbell for a lengthy period of time and did not observe a traffic infraction does not discredit Deputy Lilly's testimony. The surveillance team focused on Campbell's actions; its members were not looking for traffic infractions. It was Lilly and Smith's responsibility to determine if Campbell committed a traffic infraction. However, the Court notes its disagreement with the Magistrate Judge's conclusion that the agents did not observe a traffic infraction because they are not trained in that area.

Finally, the Court does not find Deputy Lilly contradicted himself. There is confusion in the record about whether Deputy Lilly stopped Campbell on Santa Rosa or

12

Buena Vista because the traffic stop occurred on the corner of those two streets. In addition, it is not contradictory to say on the one hand that White looked like she was kicking something while on the other hand saying she was moving her left leg.

Deputy Lilly's belief that Campbell committed a traffic infraction was based on more than mere suspicion, and he was in the best position to observe the traffic infraction. The Court finds his testimony credible.

### B. Was the Detention of Campbell During the Traffic Stop Constitutional?

Campbell says the Magistrate Judge's conclusion that his detention during the traffic stop was justified based on *Virginia v. Moore*, 128 S.Ct. 1598 (2008), is improper because *Moore* involved a criminal offense, not a civil infraction.

The Court need not reach that issue. The Magistrate Judge concluded as an alternative that Deputy Lilly had reasonable suspicion of drug trafficking to justify Campbell's detention.

The Court agrees.

Once Deputy Lilly completed the traffic stop, he could not detain Campbell further unless something happened during the stop to cause Deputy Lilly to have a "reasonable and articulable suspicion that criminal activity [is] afoot." *United States v. Davis*, 430 F.3d 345, 353 (6th Cir. 2005) (citations omitted). Reasonable suspicion is less demanding than a probable cause standard and requires a showing considerably less than preponderance of the evidence. *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). Nevertheless, there must be at least a minimal level of objective justification for the detention. *See id.*

13

Campbell was extremely nervous when Deputy Lilly approached the car. While nervousness is an unreliable indicator of illegal activity and is given very limited or no weight in the reasonable suspicion calculation, *United States v. Urrieta*, 520 F.3d 569, 577 (6th Cir. 2008), it is reasonable to conclude that an extreme display of nervousness would elevate the level of suspicion that more than a traffic infraction engenders.

Campbell's nervousness must be added to the information Deputy Lilly obtained during the briefing: Deputy Lilly observed White move her leg in a kicking motion like she was hiding something, and Campbell stated *he did not think* he had drugs in the car. Based on this collective information, it was reasonable for Deputy Lilly to detain Campbell even after Campbell provided a valid license, registration, and insurance.

Deputy Lilly did not violate Campbell's Fourth Amendment rights. The totality of the circumstances gave Lilly reasonable and articulable suspicion that drug trafficking was afoot.

### C. Did the Detention Rise to the Level of an Arrest that Requires Probable Cause?

Campbell says when Deputy Lilly confiscated his car keys and ordered him out of the car during Chief's sniff, it constituted a *de facto* arrest in violation of his constitutional rights.

The Court disagrees.

While it is a seizure when a police officer stops a car and detains the occupants, *United States v. Calderon-Valenzuela*, 2000 WL 571953 at *3 (6th Cir. May 3, 2000) (citing *Terry v. Ohio*, 392 U.S. 1 (1968)), traffic stops are "more akin to an investigative detention rather than a custodial arrest[.]" *Hill*, 195 F.3d at 264.

14

"[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *United States v. Davis*, 430 F.3d 345, 354 (6th Cir. 2005) (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983)). The investigative detention turns into an arrest through the passage of time or the use of force. *Houston v. Clark County Sheriff Deputy John Does 1-5*, 174 F.3d 809, 814 (6th Cir. 1999). If the traffic stop ripens into an arrest, the officer needs probable cause to continue the detention. *Id.* (citing *United States v. Avery*, 137 F.3d 343, 349 (6th Cir. 1997)).

Deputy Lilly's detention of Campbell did not ripen into a *de facto* arrest. The detention only lasted until the canine unit arrived and "Chief" sniffed – a period of less than an hour. This is a reasonable amount of time to dispel Deputy Lilly's suspicion of whether drugs were in the car. *See e.g., United States v. Orsolini*, 300 F.3d 724, 730 (6th Cir. 2002) (not unreasonable for an investigation to last less than one hour).

Confiscating Campbell's car keys was "reasonably related" to the investigation of whether the car contained drugs. *See Houston*, 174 F.3d at 814 ("the length and manner of an investigative stop should be reasonably related to the basis for the initial intrusion") (citing *United States v. Palomino*, 100 F.3d 446, 449 (6th Cir. 1996)). Lilly did not want Campbell to flee the scene while he waited for the canine unit.

Further, Campbell was ordered out of the car for his own protection against an aggressive canine dog; if Campbell and White were not out of the car, "Chief" could not sniff. This, therefore, was "reasonably related" to the investigation.

**D.     Are Campbell's Statements "Fruit of the Poisonous Tree"?**

Citing *Wong Sun v. United States*, 371 U.S. 471 (1963), Campbell asks the Court

to suppress his inculpatory statements because they are "fruit of the poisonous tree." *See Wong Sun*, 371 U.S. at 485 (verbal evidence is inadmissible if it derived from official illegality).

Because the Court concludes that Deputy Lilly's actions were legal and did not violate Campbell's Fourth Amendment rights, the "fruit of the poisonous tree" doctrine does not apply. Campbell's statements are admissible.

## IV. CONCLUSION

The Court **ADOPTS** the Magistrate Judge's R&R. Campbell's motion to suppress is **DENIED**.

**IT IS ORDERED**.

S/Victoria A. Roberts  
Victoria A. Roberts  
United States District Judge

Dated: October 30, 2008

| |
|---|
| The undersigned certifies that a copy of this document was served on the attorneys of record by electronic means or U.S. Mail on October 30, 2008.<br><br>s/Carol A. Pinegar<br>Deputy Clerk |